UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

IN RE MOTORS LIQUIDATION COMPANY      16 Civ. 6927 (PKC)
f/k/a General Motors Corporation, et al.,

         Debtors.

                                        Chapter 11
                                        Case No. 09-50026 (MG)

-------------------------------------------------------------------------x

DAVIDSON KEMPNER CAPITAL MANAGEMENT LP,

                               MEMORANDUM
                                <u>AND ORDER</u>

         Appellant,

     -against-

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF MOTORS LIQUIDATION COMPANY, MOTORS
LIQUIDATION COMPANY AVOIDANCE ACTION
TRUST, UNITED STATES DEPARTMENT OF THE
TREASURY, and EXPORT DEVELOPMENT CANADA,

         Appellees.
-------------------------------------------------------------------------x

CASTEL, Senior District Judge:

           This appeal arises out of the bankruptcy of Motors Liquidation Company,

formerly known as General Motors Corporation, and related entities (together, "Old

GM"). Appellant Davidson Kempner Capital Management LP ("Davidson") appeals the

August 24, 2016 memorandum opinion and order (the "Memorandum Opinion and

Order") of the bankruptcy court (Martin Glenn, U.S.B.J.) approving a settlement, related

to a dispute over entitlement to certain assets of the debtor, among the Official

Committee of Unsecured Creditors, the U.S. Department of Treasury, Export

Development Canada, and the Motors Liquidation Company Avoidance Action Trust,

and a stipulation and agreed order (the "Stipulation and Agreed Order") so-ordered on

August 30, 2016 effectuating the settlement.  Davidson asserts that the matter resolved in the settlement was not ripe for review by the bankruptcy court.  Alternatively, it argues that if the bankruptcy court had jurisdiction, it abused its discretion in entering the August 24, 2017 Memorandum Opinion and Order approving the settlement and so-ordering the Stipulation and Agreed Order (together, the "Orders").  For the reasons explained, the bankruptcy court had jurisdiction to enter the Orders and did not abuse its discretion in approving the settlement.  The Orders are affirmed and the appeal is dismissed.

BACKGROUND

The factual background of Old GM's bankruptcy and the events leading up to the bankruptcy court's approval of the settlement are not disputed.

I.  Old GM's Secured Financing Arrangements.

In October 2001, over seven years before filing for bankruptcy, Old GM entered into a synthetic lease financing transaction (the "Synthetic Lease"),[1] by which it obtained approximately $300 million in financing from a syndicate of financial institutions, using the proceeds to acquire and construct facilities on several properties. In re Motors Liquidation Co., 755 F.3d 78, 79 (2d Cir. 2014).  Old GM's obligation to repay the Synthetic Lease was secured by liens on twelve pieces of real estate.  Id.  The lenders' security interests in Old GM's properties were perfected by filing UCC–1 financing statements in the counties in which the properties were located and with the Delaware Secretary of State.  Id.

---

[1] A synthetic lease is a financing transaction under which an asset (most commonly real property) is acquired not by its user but a by a separate entity (often a special purpose vehicle) which then leases the asset to the ultimate user.  In re Motors Liquidation Co., 486 B.R. 596, 603 n.4 (Bankr. S.D.N.Y. 2013).

In November 2006, over two years before filing for bankruptcy, Old GM and then-subsidiary Saturn Corporation entered into a separate term loan facility (the "Term Loan"). Id. The Term Loan was entirely unrelated to the Synthetic Lease and provided Old GM with approximately $1.5 billion in financing from a different syndicate of financial institutions (the "Term Loan Lenders"). Id. To secure the loan, the lenders took security interests in a large number of Old GM's assets, including all of Old GM's equipment and fixtures at forty-two facilities throughout the United States. Id.

JPMorgan Chase Bank, N.A. ("JPMorgan") served as the administrative agent and secured party of record for both the Synthetic Lease and the Term Loan. Id. In connection with the Term Loan, JPMorgan caused the filing of twenty-eight UCC–1 financing statements to perfect the lenders' security interests in the collateral. Id. The most important of these financing statements, the Main Term Loan UCC–1, was filed with the Delaware Secretary of State. Id.

In October 2008, in connection with Old GM repaying its creditors and closing the Synthetic Lease transaction, Old GM's counsel filed two UCC–3 statements with the Delaware Secretary of State to terminate liens against Old GM's properties in connection with the Synthetic Lease. Id. at 81-82. In addition to these documents, Old GM's counsel mistakenly filed a third UCC–3 statement that erroneously identified the Main Term Loan UCC–1 for termination. Id. at 81-82. Old GM, JPMorgan, and both companies' separate counsel reviewed these documents before they were filed. In re Motors Liquidation Co., 777 F.3d 100, 101 (2d Cir. 2015). This mistake went unnoticed until after Old GM filed for bankruptcy. Id.

II.      Old GM Files for Bankruptcy.

On June 1, 2009 (the "Petition Date"), Old GM filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (Memorandum Opinion and Order at 4.) That same day, Old GM as debtor filed a motion seeking authority from the bankruptcy court to obtain $33.3 billion in post-petition financing (the "DIP Financing") from the United States Department of the Treasury and Export Development Canada (collectively, the "DIP Lenders"). (Id.) The bankruptcy court approved three DIP Orders: (1) the Interim DIP Financing Order, entered on June 2, 2009, (2) the Final DIP Financing Order, entered on June 25, 2009, and (3) the modified final DIP financing order, entered on July 5, 2009. (Id.)

Old GM, as debtor, requested and was granted authority to use a portion of the DIP Financing to fully repay the approximately $1.5 billion Term Loan. (Id. at 5.) On the assumption that the Term Loan Lenders' claims arising under the Term Loan Agreement were fully secured, Old GM repaid the Term Loan Lenders in full. (Id.) However, before the entry of the Final DIP Financing Order, the Official Committee of Unsecured Creditors (the "Committee") learned that the Term Loan Lenders' security interests may not have been perfected as of the Petition Date as a result of the erroneously filed UCC–3. (Id.) Therefore, the Final DIP Financing Order, while conditionally approving repayment of the Term Loan, expressly preserved the right for the Committee to investigate and bring actions based upon, among other things, the purported perfection of the security interests related to the Term Loan. (Id.)

III.    The Term Loan Avoidance Action and Dispute over Potential Recovery.

On July 31, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court (the "Term Loan Avoidance Action") to recover amounts paid to the Term Loan Lenders after the Petition Date based on the erroneous assumption that the Term Loan Lenders' interests were perfected and their claims fully secured.  (Id.) The Committee alleged that the Term Loan Lenders' security interest with respect to the collateral secured by the Main Term Loan UCC–1 was not perfected as of the Petition Date, and that the Term Loan Lenders were thus substantially undersecured.  (Id.)

On March 29, 2011, the bankruptcy court entered an order confirming the plan, which provided for the creation of the Motors Liquidation Company Avoidance Action Trust (the "Trust") to liquidate and distribute its non-administrative assets, which would consist entirely of the proceeds, if any, of the Term Loan Avoidance Action.  (Id. at 5-6.)  In December 2011 the prosecution of the Term Loan Avoidance Action was transferred to the Trust.  (Id. at 6.)

The DIP Lenders and the Committee disputed whether the DIP Lenders could be repaid out of any proceeds from the Term Loan Avoidance Action.  (Id.)  On June 6, 2011, the Committee commenced an adversary proceeding before the Bankruptcy Court, seeking a declaratory judgment that the DIP Lenders were not entitled to any proceeds from the Term Loan Avoidance Action, and that the holders of the allowed general unsecured claims were entitled to all proceeds of the Term Loan Avoidance Action and were the sole beneficiaries of the Trust.  (Id.)  On December 12, 2011, the bankruptcy court ruled in favor of the Committee, granting the Committee's motion for summary judgment.  (Id.)

The DIP Lenders appealed, and then District Judge Colleen McMahon of this Court vacated the judgment on the grounds that the dispute between the parties was not ripe, and remanded with instructions to the bankruptcy court to dismiss the complaint without prejudice due to lack of subject matter jurisdiction. United States Dep't of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co., 475 B.R. 347, 367 (S.D.N.Y. 2012). In her decision and order, Judge McMahon concluded that if the defendants in the Term Loan Avoidance Action (i.e., the Term Loan Lenders), prevailed on their then-pending motion for summary judgment, there would be no recovery in the Term Loan Avoidance Action and no proceeds for the Trust to distribute, and the dispute over any potential proceeds between the DIP Lenders and the Committee would be moot. Id. at 360. At the heart of Judge McMahon's reasoning was the principle that "until it is clear that the parties are fighting over something more than the hypothetical outcome of a separate litigation, it is premature to decide which among several claimants would be entitled to any hypothetical proceeds." Id. at 366. Judge McMahon continued, explaining that this "renders the dispute before this Court lacking in sufficient immediacy and reality to warrant declaratory relief at this juncture. There is no case or controversy in the constitutional sense to decide; the action is not ripe." Id.

IV.     The Second Circuit Grants Summary Judgment against the Term Loan
         Lenders.

On March 1, 2013, on cross-motions for summary judgment in the Term Loan Avoidance Action, the Bankruptcy Court concluded that the UCC–3 filing at issue was unauthorized and therefore not effective to terminate the security interest of the Term Loan Lenders and granted summary judgment to the defendants. In re Motors Liquidation Co., 755 F.3d at 82; In re Motors Liquidation Co., 486 B.R. at 647. The

bankruptcy court certified the case for direct appeal to Second Circuit pursuant to 28 U.S.C. § 158(d)(2). In re Motors Liquidation Co., 755 F.3d at 82.

The Second Circuit determined that the question of whether the erroneously filed UCC–3 effectively terminated the Main Term Loan UCC–1 was governed by Delaware's version of the UCC. Id. Under U.C.C. § 9–509 (6 Del. C. § 9-509) a person may file a termination statement only if "the secured party of record authorizes the filing." Thus, "whether the UCC–3 filing effectively terminated the Main Term Loan UCC–1 depends on whether the secured party of record, JPMorgan, authorized the filing." In re Motors Liquidation Co., 755 F.3d at 83. The defendants argued that the UCC–3 filing cannot have been authorized because the termination agreement only granted authority to terminate the Synthetic Lease, and no one involved with the transaction thought they were authorized to terminate the Main Term Loan UCC–1 or that their actions would have that effect. Id. The Trust argued that even if JPMorgan did not authorize the termination of the security interest underlying the Term Loan, it had authorized the act of filing the UCC–3 statement that identified that security interest for termination. Id. at 83-84. This, the Trust argued, had the effect of terminating the Main Term Loan UCC–1. Id. at 84.

The Second Circuit explained the two-part inquiry that was required, certifying the question of what constituted authorization under the Delaware UCC to the Delaware Supreme Court, and reserving to itself the application of the clarified law to the facts of the case:

> Intertwined in this appeal are two closely related questions.
> First, the question we certify below, is what precisely a
> secured lender of record must authorize for a UCC–3
> termination statement to be effective: Must the secured

7

lender authorize the termination of the particular security interest that the UCC–3 identifies for termination, or is it enough that the secured lender authorize the act of filing a UCC–3 statement that has that effect?  Second, a question we will address upon receipt of the Delaware court's answer: Did JPMorgan grant to Mayer Brown the relevant authority—that is, alternatively, authority either to terminate the Main Term Loan UCC–1 or to file the UCC–3 statement that identified that interest for termination?

Id. at 84.

The Delaware Supreme Court answered the certified question, replying that "if the secured party of record authorizes the filing of a UCC–3 termination statement, then that filing is effective regardless of whether the secured party subjectively intends or understands the effect of that filing."  In re Motors Liquidation Co., 777 F.3d at 104.  On the question it reserved for itself, the Second Circuit found that "although JPMorgan never intended to terminate the Main Term Loan UCC–1, it authorized the filing of a UCC–3 termination statement that had that effect," and reversed the bankruptcy court's grant of summary judgment for the defendant and remanded with instructions to the bankruptcy court to enter partial summary judgment for the plaintiff as to the termination of the Main Term Loan UCC–1.  Id. at 105-06.

V.     Motion for Approval of Settlement.

The initial administrative assets of the Trust consisted of approximately $1.6 million in cash to be held and maintained by the Trust administrator for fees and expenses in connection with Trust administration and prosecution of the Term Loan Avoidance Action.  (Memorandum Opinion and Order at 7.)  However, this proved to be insufficient to cover litigation costs related to the Term Loan Avoidance Action and to satisfy the Trust's general administrative costs.  (Id.)  On January 20, 2012, the Motors

Liquidation Company GUC Trust (the "GUC Trust") filed a motion seeking, among other things, to liquidate securities to fund additional Trust costs. (Id.) The bankruptcy court granted the GUC Trust's motion and entered an order, which, among other things, allocated an additional $13,714,000 to the Trust to satisfy the Trust's estimated fees, costs, and expenses for 2012, 2013, and 2014. (Id.)

Subsequently the Trust administrator, in consultation with the Trust monitor, determined that the cash available to the Trust was insufficient to meet its projected fees and expenses. (Id.) The Trust administrator commenced a competitive bidding process to obtain private funding for the Trust. (Id. at 8.) On April 4, 2016, the Trust reached an agreement in principle with a private funder (the "Private Funder") for a $15 million loan in exchange for a return that could be as high as the greater of 2.25 times the amount of the funds drawn or 4.75% of the aggregate proceeds of the Term Loan Avoidance Action. (Id.) On May 19, 2016, the Trust provided the DIP Lenders with a copy of the executed litigation funding agreement with the Private Funder (the "Private Litigation Funding Agreement"). (Id.) On June 23, 2016, the Trust sought approval of the Private Litigation Funding Agreement. (Id.) Included in the Private Litigation Funding Agreement was a provision which permitted the Trust to terminate the Private Litigation Funding Agreement within a certain period of time in the event that the DIP Lenders agreed to provide funding to the Trust on terms materially more favorable to the Trust than those provided by the investors under the Private Litigation Funding Agreement. (Id.)

Subsequently the Trust obtained litigation funding on better terms in the form of a litigation cost advance from the DIP Lenders; it therefore sought to terminate

the Private Litigation Funding Agreement.  (Id. at 8-9.)  The DIP Lenders, the Trust, and

the Committee entered into the Stipulation and Agreed Order whereby after repayment of

all DIP Lender advances and the advances from the GUC Trust, the DIP Lenders would

receive 30% of the remaining net proceeds resulting from the Term Loan Avoidance

Action and the unsecured creditors would receive the remaining 70%, with each such

distribution to the DIP Lenders and unsecured creditors to be made contemporaneously

and on a pari passu basis.  (Id. at 8.)  This Stipulation and Agreed Order was conditioned

upon the DIP Lenders providing a $15 million advance (the "Litigation Cost Advance

Agreement," collectively with the Stipulation and Agreed Order, the "Settlement") to

fund the Term Loan Avoidance Action and related litigation.  (Id.)  The movants

requested the bankruptcy court enter the Stipulation and Agreed Order and approve the

Litigation Cost Advance Agreement.  (Id. at 9.)

        Davidson objected to the bankruptcy Court's approval of the Stipulation

and Agreed Order, arguing that the Stipulation and Agreed Order, along with the

Litigation Cost Advance Agreement, provided litigation funding at a significantly higher

cost than the Private Litigation Funding Agreement, that approval could thus expose the

Trust to a claim for breach of contract, and that the bankruptcy court lacked jurisdiction

to approve the settlement because at the time there was no ripe case or controversy

between the parties to the Settlement.  (Id. at 10-11.)  River Birch Capital, LLC, lodged

similar objections.  (Id. at 11.)

        The United States responded, arguing that the Settlement was reasonable

because it avoided the potential adverse outcome of a court deciding that the unsecured

creditors were not entitled to any proceeds from the Term Loan Avoidance Action, that it

maximized the return to Trust beneficiaries because, unlike the Private Litigation Funding Agreement, it provided a no-interest, no-fee advance of litigation costs, and that the dispute over the proceeds was ripe for judicial determination. (Id. at 12-13.) The Trust administrator responded with similar arguments. (Id. at 13-14.) The Committee argued that the Settlement was reasonable and should be approved. (Id. at 15.)

The bankruptcy court entered the August 24, 2017 Memorandum Opinion and Order, approving the Settlement under Rule 9019, Fed. R. Bankr. P., evaluating the Settlement under the seven factor test set down by the Second Circuit in Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (the "Iridium factors") and finding that the Settlement was fair, equitable, and within the range of reasonableness. (Memorandum Opinion and Order at 18, 24.) Six days later the bankruptcy court so-ordered the Stipulation and Agreed Order.

VI.     Davidson's Appeal.

Davidson timely appeals from the Orders on two grounds. First, Davidson argues that the bankruptcy court lacked jurisdiction under Article III of the Constitution to enter the Orders because the dispute over the allocation of the proceeds of the Term Loan Avoidance Action was not ripe and there was thus no case or controversy. Second, Davidson argues that even if there was a live case or controversy, the bankruptcy court misapplied the Iridium factors and abused its discretion by entering the Orders.

DISCUSSION

I.     Standard of Review.

A bankruptcy court's legal conclusions are reviewed de novo. In re

Zarnel, 619 F.3d 156, 161 (2d Cir. 2010). Its factual determinations are reviewed for

clear error. In re Penn Traffic Co., 524 F.3d 373, 378 (2d Cir. 2008).

The reasonableness of a bankruptcy court's application of Rule 9019, Fed. R. Bankr. P.,

in approving a settlement is reviewed for abuse of discretion. In re Iridium Operating

LLC, 478 F.3d at 461 n.13. A reviewing court should overturn a bankruptcy court's

approval of a settlement under Rule 9019 only if the settlement falls "below the lowest

point in the range of reasonableness." In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.

1983)

II.     Application.

A. The Bankruptcy Court had Jurisdiction to Approve the Settlement.

"Article III of the Constitution limits the jurisdiction of federal courts to

'Cases' and 'Controversies.'" Lance v. Coffman, 549 U.S. 437, 439 (2007). To be

appropriate for judicial determination, a case or controversy "must be definite and

concrete, touching the legal relations of parties having adverse legal interests. . . . That

is, courts may not give an opinion advising what the law would be upon a hypothetical

state of facts, for instance, where a party did not seek the adjudication of any adverse

legal interests." Elliott v. GM LLC (In re Motors Liquidation Co.), 829 F.3d 135, 168

(2d Cir. 2016) (internal quotation marks and citations omitted). These limitations also

apply to bankruptcy courts. Id.

The related doctrine of ripeness, "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," is "peculiarly a question of timing." Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687 (2d Cir. 2013). "A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all. The doctrine's major purpose is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Id. (internal quotation marks and citation omitted). "The standard for ripeness in a declaratory judgment action is that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005) (internal quotation marks omitted).

It may be that, insofar as ripeness and mootness are concerned, the circumstance of a bankruptcy proceeding is fundamentally different from a plenary action pending in district court. Indisputably, there is subject matter jurisdiction over a bankruptcy proceeding and the court may adjudicate the rights and interests of those who claim an interest in the bankrupt's estate. But there is scant precedent addressing the authority of a bankruptcy court to approve a settlement under Rule 9019 in the face of a ripeness or mootness argument. On the present briefing, this Court is not prepared to say that a bankruptcy court must always first adjudicate claims of ripeness and mootness before addressing the question of the appropriateness of a settlement. Here, the Court comfortably concludes that there was a case or controversy between the DIP Lenders and the Committee that was ripe for adjudication by the bankruptcy court.

Because the dispute between the DIP Lenders and the Committee regards the apportionment of funds derived from a potential future recovery in the Term Loan Avoidance Action, it is possible that any determination by the bankruptcy court as to either sides' entitlement to such funds would ultimately have no effect. However, the simple fact that the dispute is over a contingent claim does not render the dispute beyond the scope of an Article III case or controversy. <u>Associated Indem. Corp. v. Fairchild Indus., Inc.</u>, 961 F.2d 32, 35 (2d Cir. 1992) ("That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action."). A court must assess "the practical likelihood that the contingencies will occur." <u>Id.</u>

In the context of a declaratory judgment action between an insurer and an insured over entitlement to potential future recoveries in ongoing tort litigation against third parties, the Second Circuit found in a summary order that the dispute was ripe for judicial determination, noting the "practical likelihood" of recovery. <u>SR Int'l Bus. Ins. Co. v. Allianz Ins. Co., L.L.C.</u>, 343 F. App'x 629, 631-32 (2d Cir. 2009) (summary order).

Davidson relies on <u>Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.</u>, 90 F.3d 671, 672, 676 (2d Cir. 1996), where the Second Circuit upheld the district court's dismissal of a declaratory judgement action by an excess liability insurer against the insured to determine the status of the insurer's obligations as not a ripe controversy. In that case, the insured, having conducted mining and smelting operations throughout the United States for approximately a century, was exposed to potentially significant liability after being identified as a Potentially Responsible Party ("PRP") pursuant to the Comprehensive Environmental Response, Compensation, and Liability

Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., for twenty contaminated sites. Id. at 672-73. This case is readily distinguishable from the case at hand. In Lloyd's, the obligation of the excess liability insurer was contingent upon, among other factors, the possibility of the Environmental Protection Agency designating other entities as PRPs at the contaminated sites, id. at 673, unresolved legal questions regarding the liability of subsidiaries, id. at 673-74, the allocation of liability among the various PRPs, id. at 674, apportionment of liability over more than six decades, id., and potential contribution to the insured from third parties, id. For more than half of the contaminated sites, the insurer produced no evidence of the potential likelihood or extent of liability, and for multiple sites the insured produced conflicting evidence regarding the extent of liability. Id. at 673. Ultimately, the Second Circuit determined that:

> [T]he record as a whole consists in large measure of speculation. Uncertainty surrounds [the insured]'s liability. It has viable defenses, there are numerous other PRPs to share the unestablished remedial costs, and the challenged activity is spread out over a substantial time period, during much of which [the insurers'] policies were not in existence.

Id. at 674.

The present case is much more like SR Int'l Bus. Ins. Co. than Lloyd's. The Second Circuit found that the UCC–3 filed by JPMorgan terminated the Main Term Loan UCC–1, and thus a significant portion of the Term Loan Lenders' security interest in Old GM's assets. In re Motors Liquidation Co., 777 F.3d at 105-06. The Term Loan Avoidance Action then survived a motion to dismiss in the bankruptcy court. Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.), 552 B.R. 253, 282 (Bankr. S.D.N.Y. 2016). Both of these events occurred prior to the bankruptcy court's approval of the Settlement. Following

discovery, the bankruptcy court held a trial to determine (a) which of 40 representative assets (out of over 200,000 total assets) were fixtures, and (b) the valuation of each of the representative assets. (Joint Final Pretrial Order, April 19, 2017, 09-00504-mg, Dkt. 962 at 2). The parties have submitted full post-trial briefing and proposed findings of fact and conclusions of law, which are pending before the bankruptcy court. (Case No. 09-00504-mg, Dkts. 993, 994.) The potential for recovery from the Term Loan Avoidance Action has thus surpassed speculative and is approaching a practical likelihood. The dispute over the proceeds of the Term Loan Avoidance Action was ripe for judicial determination at the time the bankruptcy court approved the Settlement.

Judge McMahon's 2012 decision that there was not then a case or controversy does not foreclose a finding that there was a case or controversy as of August 24, 2016, the date of Judge Glenn's Memorandum Opinion and Order approving the Settlement. The "general rule" of issue preclusion is that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." B&B Hardware, Inc. v. Hargis Indus., 135 S. Ct. 1293, 1303 (2015) (alteration in original). However, "a decision that a matter is not ripe for review does not necessarily hold for all time. Things ripen. . . . [S]uit may be brought again where a jurisdictional defect has been cured or loses its controlling force." Park Lake Res. Ltd. Liab. Co. v. USDA, 378 F.3d 1132, 1137 (10th Cir. 2004).

As discussed above, the Term Loan Avoidance Action has progressed substantially since Judge McMahon's ruling five years ago. The issues addressed in

summary judgment motions, pending before the bankruptcy court when Judge McMahon issued her decision, have since been resolved by the Second Circuit in favor of the Trust. The Trust's complaint has survived a motion to dismiss and a trial has concluded. Judge McMahon found that the Term Loan Lenders were just as likely to prevail as the Trust on the question of whether the Main Term Loan UCC–1 was terminated by the erroneously filed UCC–3, and that "[n]either side ha[d] the upper hand." <u>United States Dep't of the Treasury</u>, 475 B.R. at 366. This is no longer the case. Circumstances have changed. The dispute over the allocation of proceeds from the Term Loan Avoidance Action has ripened. The judgment does not have preclusive effect. Further, the Trust was not a party to the prior action, and thus the requirement that the precluded party "ha[ve] a full and fair opportunity to litigate the issue" is not met. <u>Ball v. A.O. Smith Corp.</u>, 451 F.3d 66, 69 (2d Cir. 2006).

In the alternative, the Court finds that a ripe and justiciable controversy existed between the Committee, the DIP Lenders, and the Trust at the time the Trust entered the Private Litigation Funding Agreement in order to continue to pursue the Term Loan Avoidance Action.[2] The Private Litigation Funding agreement, finalized in June 2016, entitled third parties to substantial sums out of any recovery in the Term Loan Avoidance Action. Unchallenged, the Private Litigation Funding Agreement would diminish any potential recovery by either the Committee or the DIP Lenders. There was thus an actual controversy between the Committee and the DIP Lenders on the one hand, and the Trust, on the other. The provision allowing the Trust to terminate the Private

---

[2] This dispute, not having occurred until after Judge McMahon's decision, was not and could not have been addressed in that decision, which thus has no issue preclusive effect regarding the ripeness of this controversy.

Litigation Funding Agreement upon the Trust attaining alternative litigation funding on more favorable terms was operative for only a limited time. (Memorandum Opinion and Order at 8.) The controversy was thus ripe for judicial determination. In other words, even if the dispute between the Committee and the DIP Lenders over potential future proceeds of the Term Loan Avoidance Action was not a ripe controversy, the dispute between those parties, as beneficiaries of the Trust, and the Trust itself, over the Private Litigation Funding Agreement, was a ripe controversy, and the bankruptcy court had jurisdiction to approve the Settlement, which, while settling the latter, ripe controversy, also had the tangential effect of doing away with the former, unripe dispute.

      B.  The Bankruptcy Court did not Abuse its Discretion by Finding that the <u>Settlement was Fair and Equitable.</u>

The Second Circuit has set out the factors by which a court should evaluate the reasonableness of a settlement under Rule 9019, Fed. R. Bankr. P. <u>In re Iridium Operating LLC</u>, 478 F.3d at 462. Upon review, this Court concludes that the bankruptcy court assessed the settlement under the proper standard and did not abuse its discretion in approving the Settlement.

The bankruptcy court found that the first <u>Iridium</u> factor ("the balance between the litigation's possibility of success and the settlement's future benefits," <u>In re Iridium Operating LLC</u>, 478 F.3d at 462) weighed in favor of approving the Settlement. (Memorandum Opinion and Order at 22.) The bankruptcy court found that the outcome of any future litigation between the DIP Lenders and the Committee over the proceeds of the Term Loan Avoidance Action was uncertain and that the Settlement would not only resolve this long standing dispute, but would also maximize recovery by both sides through access to a costless litigation advance. (<u>Id.</u>)

Davidson's primary argument with respect to the first Iridium factor is that the Private Litigation Funding Agreement, to which Davidson was a party, actually provided for litigation funding at a lower cost than the Litigation Cost Advance Agreement approved as part of the Settlement. (Davidson Opening Brief at 24-26.)

Davidson's argument lacks merit. While an unwary observer might at first be persuaded by the charts Davidson submitted purporting to show that the recovery to the unsecured creditors would be greater under the Private Litigation Funding Agreement than it would be under the funding provided pursuant to the Settlement, closer examination reveals these contentions to lack merit. Davidson's entire argument rests on an unsupported assumption: that after successful litigation against the DIP Lenders (or superior settlement terms) the Committee would be entitled to, subtracting litigation costs and financing fees, more than 70% of the proceeds of the Term Loan Avoidance Action, such that the recovery to the Committee would be higher, even when paying a premium for funding through the Private Litigation Cost Advance Agreement, than it would be pursuant to the Settlement.

There is no reason to believe that the Committee could get substantially better settlement terms absent the Litigation Cost Advance Agreement or that litigation against the DIP Lenders over the proceeds of the Term Loan Avoidance Action would be short or easy. As the bankruptcy court noted, "[t]he Settlement was negotiated by very experienced counsel, at arm's length, and approved by the Committee's members after due deliberations," and that it was "entirely possible" that the Committee would lose future litigation against the DIP Lenders. (Memorandum Opinion and Order at 21-22.)

The bankruptcy court thus did not abuse its discretion in finding that the first <u>Iridium</u> factor weighed in favor of approving the Settlement.

The bankruptcy court found that the second <u>Iridium</u> factor ("the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment," <u>In re Iridium Operating LLC</u>, 478 F.3d at 462 (internal quotation marks omitted)) also weighed in favor of approving the Settlement, explaining that a "lengthy trial and appeals process" was likely absent settlement.  (Memorandum Opinion and Order at 22-23.)  Davidson challenges this assertion, yet itself acknowledges that a trial before the bankruptcy court could take up to six months, district court review on appeal could take up to a year, with Second Circuit review years in the future.  (Davidson Opening Brief at 28-29.)  The bankruptcy court did not abuse its discretion with respect to the second <u>Iridium</u> factor.

The bankruptcy court found that the third <u>Iridium</u> factor ("the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement," <u>In re Iridium Operating LLC</u>, 478 F.3d at 462 (internal quotation marks omitted)) was inconclusive.  (Memorandum Opinion and Order at 23.)  Davidson argues that this factor weighs in favor of rejecting settlement, based primarily upon the same unsupported assumptions discussed with respect to the first <u>Iridium</u> factor.  (Davidson Opening Brief at 29-30.)  The bankruptcy court did not abuse its discretion with respect to the third <u>Iridium</u> factor.

The bankruptcy court found that the fourth <u>Iridium</u> factor ("whether other parties in interest support the settlement," <u>In re Iridium Operating LLC</u>, 478 F.3d at 462)

weighed in favor of approving the Settlement, noting that no creditor opposed the Settlement other than Davidson, which had a private financial interest against the Settlement. (Memorandum Opinion and Order at 24.) The bankruptcy court did not abuse its discretion with respect to the fourth Iridium factor.

The bankruptcy court found that the fifth ("the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing, the settlement") and seventh ("the extent to which the settlement is the product of arm's length bargaining") Iridium factors, In re Iridium Operating LLC, 478 F.3d at 462 (internal quotation marks omitted; alteration in original), supported approving the settlement, and that the sixth Iridium factor was irrelevant. (Memorandum Opinion and Order at 24.) Davidson does not challenge these findings. (Davidson Opening Brief at 33.)

Balancing all of these factors, the bankruptcy court found that the Settlement was "within the range of reasonableness and should be approved." (Memorandum Opinion and Order at 24.) This Court agrees. The bankruptcy court did not abuse its discretion.

CONCLUSION

The August 24, 2016 Memorandum Opinion and Order of the bankruptcy court and the Stipulation and Agreed Order entered August 30, 2016 are AFFIRMED. The Clerk is directed to close the matter.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
August 14, 2017